E-FILED
Wednesday, 06 January, 2016  04:12:34 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| TERRY R. KNOWLES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 14-cv-3219 |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Terry R. Knowles appeals from the denial of his application for Social Security Disability Insurance Benefits (DIB) and Supplemental Security Income Disability Benefits (SSI) under Titles II and XVI of the Social Security Act.  42 U.S.C. §§ 416(i), 423 1381a, and 1382c (collectively Disability Benefits).  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  Knowles has filed a Brief in Support of Motion for Summary Judgment (d/e 11), and Defendant Commissioner of Social Security has filed a Motion for Summary Affirmance (d/e 12).  The matter is before this Court for a Report and Recommendation.  For the reasons set forth below, this Court recommends that the Decision of the Commissioner should be affirmed.

## STATEMENT OF FACTS

Knowles was born on November 25, 1987.  He completed high school and three semesters of college.  He last worked on January 31, 2008, as a personal aide for disabled people.  He briefly tried to work as a dishwasher for approximately two weeks and at a telecommunications company for two weeks.  Certified Copy of the Transcript of the Record before the Social Security Administration (d/e 8), R. 35-38.  Neither constituted substantial gainful activity.  R. 14.  Knowles suffers from morbid obesity; a history of seizure disorder; status post bilateral feet arthrodesis and arthritis; major depressive disorder; and generalized anxiety disorder.  R. 14.  Knowles protectively filed his applications for Disability Benefits on August 17, 2010.  The last date that Knowles was insured for disability insurance benefits (DIB) was March 31, 2010.  R. 12.

On November 5, 2010, Knowles saw state agency physician Dr. Joseph Kozma, M.D., for a consultative physical examination.  R. 275-81.  Knowles reported that he could not work because he was epileptic.  Knowles reported that he started having seizures when he was 8 years old.  He reported that his last seizure occurred two weeks before the examination.  He reported becoming unconscious during seizures.  R. 275.  Knowles was afraid to drive because of the seizures.  He reported that he

was depressed because he could not do anything.  Knowles reported that he did not take any medication for the seizures. R. 276.

Knowles also reported having migraine headaches every day.  He took Excedrin for the headaches.  Knowles reported that he had to lie down if the Excedrin did not work.  R. 275.  Knowles also reported frequent diarrhea.  R. 276.

Knowles reported that he had surgery on his feet at age 10 years.  He reported that he had "ruptured tendon surgery" three times at age 12 years.  Three of the surgeries were on his right foot and ankle and one was on the left ankle.  Knowles reported that all of the surgeries were related to ankle and tendon problems.  He reported that he had some fusion of his left ankle.  R. 276.

On examination, Knowles was 71 ½ inches tall and weighed "350+ pounds."  Dr. Kozma observed normal strength and range of motion in the extremities.  Dr. Kozma observed Knowles could walk normally without a cane or other assistive device.  Straight leg testing was 70 degrees on the right and 75 degrees on the left.  R. 279.  Knowles reported that he had a cane, but used it only when he was "on his feet over a longer period of time such as going to Walmart."   R. 279.  Knowles reported that, "He has pain in his feet virtually all of the time."  R. 279.

Dr. Kozma's impression was:  morbid obesity; history of seizure disorder; history of migraine headaches; and pain in his feet secondary to past surgeries.  R. 280.  Dr. Kozma opined that Knowles main problem was "morbid obesity with a body mass index of 49."  R. 279.

On November 10, 2010, state agency physician Dr. Richard X. Smith, M.D., prepared a Physical Residual Functional Capacity Assessment. R. 282-89.  Dr. Smith opined that Knowles could lift fifty pounds occasionally and twenty-five pounds frequently; could stand and/or walk about six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; should never climb ladders, ropes, or scaffolds; and should avoid concentrated exposure to hazards such as machinery and unprotected heights.  R. 283-88.

On November 12, 2010, Knowles saw psychologist Dr. Pamela Hewitt Meyer, Psy.D., LCP, for a consultative mental status evaluation. R. 290-97.  Knowles walked with a limp at the evaluation.  The limp was more noticeable when Knowles was leaving.  Knowles "complained about increased pain" while he was leaving.  R. 291.

Knowles reported that, "'I think I've always been depressed –just never told anybody and I didn't really notice 'til I couldn't work anymore— about 2008.'"  R. 291.  Knowles reported that the depression was worse

since he turned 18 years old.  R. 291.  Knowles reported that he had

depression medication, but ran out seven months before the evaluation.

He reported that he took amitriptyline.  He reported that the medication was

helpful.  R. 291.  Knowles reported that he smoked 2 ½ packs of cigarettes

per day, but did not take any other mood altering substances.  R. 292.

Knowles reported that he completed high school and three to four

semesters of college "'until it was too painful and I missed registration.'"

R. 291.  Knowles reported that he had a learning disability in math and

received special education services in grade school and high school.

R. 292.

Dr. Meyer's impression was that Knowles was oriented; pleasant and

cooperative; his mood was anxious and depressed; his attention and

concentration were impaired; his short term memory and memory

consolidation were impaired; and his intellectual functioning was average.

R. 295.  Dr. Meyer diagnosed Knowles with major depressive disorder and

generalized anxiety disorder.  R. 296.  Dr. Meyer opined, in relevant part:

> His attention and concentration were impaired as was his
> memory and as such he is likely to have difficulty with sustained
> concentration and persistence.  He appeared to be of average
> intelligence but struggled with manipulating numbers (likely due
> to a learning disability in math by report).  He appeared to
> understand questions that were asked of him and he asked for
> questions to be repeated that he did not understand but he did
> get frustrated with himself.  He appears able to engage in social

interaction appropriately but likely prefers to be alone.  He reported having a hard time adapting to his current circumstances and not having much energy or initiative.  He will therefore have difficulty with maintaining job performance and working a typical work schedule.  At this time, this claimant appears to be limited in the areas of mobility, self-care, self-direction, and work tolerance.  However, he did appear capable of maintaining his own funds.

R. 297.

On November 19, 2010, state agency psychologist Dr. Phyllis Brister Ph.D., prepared a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment for Knowles.  R. 299-316.  Dr. Brister opined on Knowles' mental state as of November 19, 2010.  R. 299. Dr. Brister opined that Knowles suffered from major depressive disorder and generalized anxiety disorder.  R. 302-04.  Dr. Brister opined that Knowles had mild restrictions on activities of daily living; mild difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence or pace.  Dr. Brister found no evidence of episodes of decompensation.  R. 309.

Dr. Brister opined that Knowles was moderately limited in his ability to understand, remember, and carry out detailed instructions; moderately limited in his ability to work in proximity to others without becoming distracted;  and moderately limited in his ability to interact appropriately with the general public.  R. 313-14.  Dr. Brister opined that Dr. Meyer's

Mental Status Evaluation "reveals intact cognitive functioning with [Knowles] demonstrating ability to understand, recall and execute simple operations of a routine, unskilled nature." R. 315. Dr. Brister opined that Knowles could "tolerate occasional social contacts and adapt to routine changes." R. 315. Dr. Brister opined that Knowles was capable of performing "simple" substantial gainful activity. R. 315.

On November 22, 2010, Dr. Brister prepared a second Psychiatric Review Technique. R. 317-29. Dr. Brister limited the new assessment to the time period from the alleged onset date, January 31, 2008, to Knowles' date last insured for DIB, March 31, 2010. Dr. Brister stated that she had insufficient evidence to render an opinion regarding Knowles' mental condition during this period. R. 317, 329.

On April 10, 2012, Knowles saw Dr. Paul Hibbert, M.D., for an initial visit. Knowles told Dr. Hibbert's nurse that he came to see Dr. Hibbert for epilepsy, depression, and chronic migraines. Knowles told the nurse he needed medication. R. 346.

Knowles told Dr. Hibbert that he was having a seizure once every six weeks. Knowles reported that his seizures were well controlled with medications in the past, but he currently did not have money or insurance to pay for medications. Knowles reported he had ankle and foot pain if he

stood or walked for any period of time.  Dr. Hibbert observed that his feet
and ankles tolerated weight bearing.  There was stiffness in his ankles and
feet, but no swelling.  Dr. Hibbert noted that Knowles was obese.  Knowles
reported depression symptoms including fatigue, lack of energy, and
difficulty concentrating.  Knowles reported headaches more than fourteen
days a month.  The headaches lasted fifteen minutes to three hours.
R. 346-47.

On examination, Knowles was six feet tall, weighed 361 pounds, and
had a body mass index (BMI) of 49.  The mental status exam was normal.
Knowles' feet and ankles were tender on palpitation, and inversion and
eversion of both ankles were abnormal.  R. 348.

Dr. Hibbert assessed epilepsy, depression, headache, and bilateral
ankle pain.  R. 348.  Dr. Hibbert prescribed carbamazepine for the
seizures, antidepressants for the depression, and amitriptyline at bedtime
for the headaches.  Dr. Hibbert advised good support shoes to support the
ankles.  Dr. Hibbert also advised a reduction in caffeine intake to help the
headaches.  R. 349.

On June 4, 2012, Knowles saw Dr. Hibbert.  Knowles reported that
his seizures were well controlled on the carbamazepine.  Dr. Hibbert
maintained the treatment regimen.  R. 343-44.

On June 6, 2012, Knowles saw a podiatrist, Dr. Jeffrey W. Fleischi, DPM, on a referral from Dr. Hibbert.  Knowles reported a history of surgeries on his right foot.  Dr. Fleischi stated that the described surgeries would have been for flat feet.  Knowles reported pain when he was active or on uneven ground.  Dr. Fleischi assessed foot pain and ordered x-rays. R. 333.  The x-rays showed degenerative changes in the mid foot, but no acute fractures or osseous lesions.  R. 356.

On June 20, 2012, Knowles saw Dr. Fleischi again.  The x-rays were completed.  Dr. Fleischi stated that Knowles had undergone a subtalar arthrodesis of the right foot.[1]  On examination, Dr. Fleischi noted pain on palpitation of the talonavicular joint, calcaneocuboid joint, and the tarsometatarsal joint.  These joints are in the mid-foot.[2]  Dr. Fleischi noted some edema "encompassing the entire foot proximally near the ankle joint." R. 332.  Dr. Fleischi assessed arthritis mid-foot.  Dr. Fleischi recommended surgery, but could not perform the surgery because of changes in public aid:

> I have told the patient that unfortunately due to changes in
> Public Aid I can no longer see him, so he is going to have to

---

[1] Arthrodesis is the fixation of a joint by the fusion of adjoining bones.  A subtalar arthrodesis is the fusion inferior to the talus bone.  The talus is the ankle bone next to the calcaneus, the heel bone.  See Dorland's Illustrated Medical Dictionary (32nd ed. 2012) (Dorland's), at 157, 728, 269, 1794, 1870.  The arthrodesis in Knowles' right foot fused these two bones.  R. 353 (MRI report showing "previous talocalcaneal arthrodesis").
[2] See Dorland's, at 728.

find an orthopedic surgeon to do his foot and ankle work.  My guess is that he has significant arthritis in the talonavicular and calcaneocuboid joint and probably needs to have those joints fused.  They work simultaneously with the subtalar joint and many times can become arthritic after subtalar fusion.  We have scheduled him for a MRI and I would go through and have this done and then can have this when he goes in and sees the other physician.

R. 332.

On June 25, 2012, an MRI of Knowles' right foot showed the previous arthrodesis, degenerative changes in the mid foot, but no fractures or destructive osseous lesions.  There was some soft tissue swelling "about the medial aspect of the ankle."  R. 353.

On June 28, 2012, Knowles saw a podiatrist, Dr. Scott Friedersdorf, DPM, for a second opinion regarding his feet.  Knowles reported that he had a subtalar fusion six years earlier.  He reported that his pain never went away and gradually worsened over time.  The pain was mainly in the mid-foot.  Knowles reported pain when he stood or walked.  Knowles wanted an opinion regarding whether he should undergo fusion of the mid-foot.  Dr. Friedersdorf assessed degenerative joint disease calcaneal cuboid, and talar navicular joints, right foot.  R. 360.  Dr. Friedersdorf opined that Knowles would benefit from surgery,

At this point I agree that I think he would benefit from a calcaneal cuboid and talar navicular joint arthrodesis to really complete the triple arthrodesis that was started a few years

ago.  He does have bad joints and is having significant pain associated with them so I would recommend proceeding with the fusion at some point.  He is going to proceed with another physician in the future.

R. 360.

On October 31, 2012, Knowles saw Dr. Hibbert for foot and ankle pain.  On examination, Dr. Hibbert observed tenderness and limited range of motion in Knowles' ankles.  Dr. Hibbert referred Knowles to an orthopedic surgeon.  R. 340-41.

On November 26, 2012, Knowles saw an orthopedic surgeon Dr. David Bingham, D.O. for his foot and ankle pain.  Knowles reported that "at rest his pain was 2/10 or 3/10, but as soon as he gets up and starts walking it very quickly reaches 10/10."  R. 337.  Dr. Bingham reviewed the x-rays and MRI ordered by Dr. Fleischi.  Dr. Bingham assessed,

Ten years status post subtalar fusion for congenital defects, now with development of talonavicular and calcaneocuboid osteoarthritis.  The calcaneocuboid arthritis seems to be the worst, which correlates with his symptoms.

R. 337.

Dr. Bingham recommended surgery, but declined to treat Knowles:

Unfortunately, the development of arthritis is not unusual.  It is a fairly common complication after joint fusion, especially in the foot.  Given the patient's level of disability, I do not think hard-soled shoes or anti-inflammatories are going to be of significant help.  I think he needs to consider arthrodesis of the affected

joints.  The patient is aware that we do not perform this
procedure here.  We will attempt a referral to Dr. Idusuyi.

R. 337.  Knowles submitted no record that he visited Dr. Idusuyi or any

other surgeon.

On March 6, 2013, the Administrative Law Judge (ALJ) held an

evidentiary hearing in this case.  Knowles appeared personally and with his

attorney.  Vocational expert Susan Shea also appeared by telephone.

R. 33-34.  Knowles testified that he last worked on January 31, 2008.  He

testified that he was fired because, "I took too may breaks, I, you know, I

couldn't stand, just stuff and I should have been working and I wasn't

basically."  R. 36.  Knowles testified that he tried working as a dishwasher

and at a telecommunications company, but only worked each job for about

two weeks.  He took too many breaks to sit down when he had the

dishwasher job because of his feet.  R. 37, 53.   He could not do the

telecommunications job because the computer screen gave him migraine

headaches and "induced more of my epilepsy."  R. 37.

Knowles testified that he was six feet two inches tall and weighed 350

pounds.  He testified that he gained fifty pounds since January 31, 2008,

due to depression and a lack of activity.  Knowles lived in a single family

home with his wife, his parents, two of his brothers, and his brother's

girlfriend.  R. 37-38.

Knowles testified that he completed high school and three semesters of community college.  He took a mix of regular and special education classes in high school.  He testified that he missed many days of school because, "Just epilepsy, depression, just didn't feel like going, didn't – I was tired all the time.  A lot of times I just overslept and then I just didn't feel like going.  I felt like kids made fun of me and, you know." R. 39.

Knowles testified that he had headaches "mostly every day" for the last year or two before the hearing. R. 39.  The headaches lasted three to four hours.  Knowles would lie down while he had a headache.  He took Excedrin for the headaches.  He testified that the headaches were increasing in intensity and frequency.  The headaches made him light sensitive and nauseous.  R. 40-41.

Knowles testified about his feet and ankles.  Knowles testified, "I have a lot of pain in my ankles.  I have severe arthritis in my right ankle."  R. 41.  He testified that he also had arthritis in his right foot.  His left foot also hurt, but his right was worse.  Knowles stated, "[M]y understanding is that I have severe arthritis and I need surgery to fuse the foot."  R. 41.  Knowles previously had surgeries to fuse parts of the foot, to remove bones from his right ankle, and to repair a ruptured tendon in his ankle.  R. 42.  Knowles testified that no additional surgery was scheduled.  R. 52.

Knowles testified that he has trouble balancing because of the fused bones in his foot, "It's hard for me to walk on unstable levels of ground and it hurts when I walk on it."  The right foot also would swell if Knowles sat in a chair for two to three hours.  Knowles testified that the right foot would also swell if he stood for thirty minutes.  R. 42.  Knowles testified that when his foot swelled, he would lie in bed with his foot elevated for three to four hours.  He testified that he needed to lie down in bed in this manner "[a] couple of times a week."  R. 43.  He testified that doctors recommended lying in bed with his foot elevated.  Knowles testified that his left foot was not as bad as the right.  He testified that the left would swell "[a] couple times a month, maybe."  R. 43.

Knowles testified that his feet would start swelling on their own without any activity "[a] couple of times a month."  R. 59.  Changes in the weather also affected Knowles' feet.  R. 59.

Knowles testified that he experienced pain when his feet swelled. R. 43.  Knowles testified that he took Tylenol Codeine 3 for leg pain.  R. 47.

Knowles testified that he had diarrhea every day since he was a child. He did not speak to doctors about this condition.  R. 44.  He testified that he went to the bathroom about ten times a day.  R. 45.

Knowles testified that for the six months before the hearing, he had seizures three to five times a week.  He testified that he had grand mal seizures in which he lost consciousness.  R. 45.  Prior to this six-month period, he had seizures "[a] couple times a month."  R. 46.  Knowles described a seizure:

> I'll get dizzy or light headed five minutes before it happens or so and then I'll just go unconscious and then they'll take a minute, maybe less or more, you know sometimes and I'll wake up and I'll just be tired, sleepy.  I'll have a headache, usually in a bad mood.

R. 46.  Knowles testified that he was taking Carbitrol for seizures.

> Knowles also described his depression symptoms:

> I'm just not wanting, not feeling like I need to, you know, not feeling like I do anything just makes me depressed, makes me not want to go anywhere.  I don't want to talk to people.  I sit in my room most of the time.

R. 47.  Knowles was taking Citalopram and Amitriptyline for his depression.  R. 46.

Knowles testified that he had panic attacks "[a] couple of times a month."  R. 47.  He testified that he has had panic attacks since he was 17 or 18 years old.  Knowles testified that he got "nervous around people . . . it feels like it's closing in around me and I just need to get air and relax."  R. 47.

Knowles testified that he had a driver's license, but did not drive because of the risk of having a seizure.  He testified that a doctor warned against driving.  Knowles testified that his wife did the shopping and housework for them.  He swept floors for ten minutes at a time.  R. 48. After ten minutes, he needed to sit down because of the pain.  R. 49. Knowles could dress himself, except his wife had to put on his socks. Knowles could take a shower.  He has not been able to get in and out of a bathtub for five years.  R. 49.

Knowles testified that he spent his days watching television. Watching television did not give him a headache.  Knowles testified that he could walk a block.  He testified that he could lift thirty to forty pounds, but could not lift with his legs.  Knowles testified that he could sit for two hours and stand for two hours in an eight-hour day.  Knowles testified that he could bend, but could not squat or stoop.  R. 50-51.  Knowles testified that he would need to lie down the rest of the time.  Knowles testified that he lay down three to four hours every day.  R. 52.  Knowles testified that having an option to sit or stand at a job would help, but he would still need to lie down part of the time.  R. 53.

Knowles testified that he had not been fitted with any special shoe. R. 52.

The ALJ asked Knowles whether his seizure medications controlled his seizures.  Knowles testified that the medication lessened the frequency of the seizures, but did not control them.  R. 54.

Knowles testified that he used a cane in 2007, but did not currently use a cane to walk.  Knowles testified that he did not walk often enough to need the cane.  He testified that he walked more in 2010 and used the cane occasionally at that time.  He used the cane for balance.  R. 55.

Vocational expert Shea then testified.  The ALJ asked Shea the following hypothetical question:

> Assume an individual the claimant's age, education and work experience who is limited to the full range of medium exertional work as defined in the regulations except the standing and walking part of that definition would be about two hours out of an eight hour day.  The individual would be limited to no more than . . . occasional bilateral foot control operation.  The individual is limited to frequent climbing of ramps and stairs, no climbing of ladders, ropes or scaffolds, occasional balancing and stooping, no kneeling, crouching or crawling.  Such an individual must avoid all exposure to hazards such as operational control of moving machinery and unprotected heights, must avoid commercial driving, limited to simple, routine and repetitive tasks, limited to occasional interaction with the public and with co-workers.  Could such an individual return to [Knowles' past work assisting disabled persons]?

R. 57.  Shea answered, "No, Your Honor."  R. 57.

Shea testified that such an individual could perform other jobs, such as sedentary hand assembler, with at least 3,000 such jobs in Illinois and

280,000 nationally; sedentary machine worker, with at least 5,000 such jobs in Illinois, and 242,000 nationally; sedentary table worker, with at least 7,000 such jobs in Illinois, and 472,000 nationally.  Shea testified that these three were a sample of the available jobs that such a person could perform. R. 58.

Shea opined that the individual could not be off task at work for more than ten percent of the time and could not be absent more than two days per month.  Shea opined that the individual could not work if he needed to be off task fifty percent of the time.  R. 58.

The ALJ asked Knowles if he had anything else he wanted to say. Knowles testified that he did not.  The ALJ then concluded the hearing. R. 59-60.

## THE DECISION OF THE ALJ

The ALJ issued his decision on March 29, 2013.  R. 12-26.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely

impaired that he is disabled regardless of his age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work considering his age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).

The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v.

<u>Astrue</u>, 649 F.3d 565, 569 (7th Cir. 2011); <u>Briscoe ex rel. Taylor v. Barnhart</u>, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Knowles met his burden at Steps 1 and 2. Knowles had not engaged in substantial gainful activity since January 31, 2008, and he suffered severe impairments due to morbid obesity; history of seizure disorder; bilateral feet arthrodesis and arthritis; major depressive disorder; and generalized anxiety disorder.  R. 14.

At Step 3, the ALJ found that Knowles did not have an impairment or combination of impairments that met or medically equaled a Listing.  The ALJ considered Listings 1.02, major dysfunction of the joints, 11.02 convulsive epilepsy; 12.01, 12.04, and 12.06 for affective and anxiety related mental disorders; and 14.09 inflammatory disorders.  R. 15.  The ALJ further stated that he considered the Social Security Policy Interpretation Ruling entitled, "Titles II and XVI:  Evaluation of Obesity," SSR 02-1p:

> Additionally, I have considered SSR 02-1p.  The current evidence, however, fails to establish an impairment that is accompanied by signs that are reflective of listing-level severity.  Also, none of the claimant's treating or examining physicians of record has reported any of the necessary clinical, laboratory, or radiographic findings specified therein, nor has the claimant's condition resulted in the inability to ambulate effectively.

R. 15.

At Step 4, the ALJ found that Knowles had the following RFC:

After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except 2 hours stand/walk and occasional bilateral foot control operation; frequent climbing of ramps and stairs; no climbing of ladders, ropes, and scaffolds; occasional balancing and stooping; no kneeling, crouching, and crawling; avoid all exposure to commercial driving and to all hazards such as operational control of moving machinery and unprotected heights; limited to simple routine repetitive tasks; and occasional interaction with the public and coworkers.

R. 17.

The ALJ relied on a detailed summary of the medical record. In particular, the ALJ relied on: (1) Dr. Hibbert's notes indicating that Knowles' epilepsy was well controlled on medication and that Knowles could bear weight on his feet; (2) Dr. Kozma's examination findings that Knowles had normal strength and dexterity, and could ambulate normally without assistance; (3) Dr. Meyer's mental status testing results that showed impairment to concentration, attention, and short-term memory, and a GAF score of 55, indicating moderate functional limitations; (4) the lack of any psychological or psychiatric treatment records; (5) the lack of any treatment record of his headaches; and (6) x-rays and MRI results that showed degenerative changes in the right mid-foot, but no acute fracture or osseous lesions. R. 19-23.

The ALJ stated that Knowles obesity "has been considered in evaluating its effects on his ability to perform basic work-related activities and in formulating the residual functional capacity."  R. 18.  The ALJ found Knowles' testimony concerning the severity of his limitations was not credible in light of the medical record and his daily activities.  R. 22.

The ALJ relied on Dr. Smith's RFC assessment of medium work, but gave it little weight because the ALJ found that the RFC should be limited to reflect more accurately Knowles' foot and ankle condition.  R. 23.  The ALJ also gave little weight to Dr. Meyer's opinion on Knowles' ability to work because the ALJ stated that the opinion "relied heavily on the claimant's subjective report of symptoms."  R. 23.  The ALJ also gave little weight to the opinions of Dr. Brister.  The ALJ rejected Dr. Brister's opinion that insufficient evidence existed to establish a mental health impairment before March 31, 2010.  The ALJ found sufficient evidence to indicate "greater limitation that opined by the State Agency psychologist."  R. 23.

At Step 4, the ALJ found that Knowles could not return to his prior work.  The ALJ relied on the RFC finding and Shea's expert testimony.  R. 24.

At Step 5, the ALJ found that Knowles could perform a significant number of jobs that exist in the national economy.  The ALJ relied on

Medical-Vocational Guidelines, 20 C.F.R. Part 404 Subpart P, Appendix 2; and the expert testimony of Shea.  The ALJ found that Knowles could perform the sedentary hand assembler, machine worker, and table worker jobs identified by Shea.  R. 25.  The ALJ concluded that Knowles was not disabled.  R. 26.

Knowles appealed the ALJ's decision.  On June 27, 2014, the Appeals Counsel denied Knowles' request for review.  The ALJ's decision then became the final decision of the Commissioner.  R. 1.  Knowles then brought this action for judicial review.

ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record.  Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008).  The ALJ must articulate at least minimally his analysis of all

relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).

The ALJ must "build an accurate and logical bridge from the evidence to his

conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ's decision is supported by substantial evidence.  The RFC

determination is adequately supported.  The opinions of Drs. Kozma and

Smith support a finding of an exertional capacity to perform a limited range

of medium work.  Knowles' testimony supports the inference that he could

stand for two hours in an eight-hour workday.  The ALJ found that Knowles'

claims of greater limitations were not credible.  Knowles does not challenge

the credibility finding in his appeal.  Dr. Hibbert's notes support the finding

that Knowles' epilepsy is well-controlled with medication.  Finally,

Dr. Brister's opinion supports the inference that Knowles could perform

routine repetitive tasks.  The restriction to routine repetitive tasks is also

consistent with Dr. Meyers' finding of impaired concentration, attention, and

short-term memory.   The ALJ also expressly considered the effects of

Knowles' obesity in formulating the RFC.

The last date Knowles was insured for DIB was March 31, 2010.

Consequently, Knowles must establish that on or before that date he was

disabled to be entitled to a period of disability and disability insurance

benefits.  The examinations and opinions of Drs. Kozma, Smith, Brister,

and Meyers referred to above all occurred in 2010 relatively close in

proximity to the expiration of the claimant's coverage expiration on March

31, 2010.  While the notes of Dr. Hibbert referred to above were not made

until 2012, his comments regarding the control of Knowles' epilepsy by

medication are not inconsistent with the examinations and opinions of Drs.

Kozma, Smith, and Meyers.

The ALJ's determination that the Commissioner met her burden at

Step 5 is supported by the RFC finding and the opinions of vocational

expert Shea.  The finding that Knowles was not disabled is supported by

substantial evidence.

Knowles argues that the ALJ erred by not giving controlling weight to

Dr. Bingham's opinions.  First, it should be noted that Knowles saw Dr.

Bingham on November 26, 2012, over two years after the expiration of

Knowles' eligibility for DIB on March 21, 2010.  Dr. Bingham's opinions and

examination contained no information regarding the condition of Knowles in

2010 prior to the date of expiration of his eligibility for DIB.

The opinion of a treating physician on the severity of a claimant's

impairments is given controlling weight if the opinion is well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is

not inconsistent with the other substantial evidence in the record.

20 C.F.R. 404.1527(c)(2).  Dr. Bingham, however, did not treat Knowles.

Dr. Bingham only saw Knowles one time.  Dr. Bingham did not order any

diagnostic tests; did not prescribe medication, physical therapy or any other

treatment.  At the end of the one visit, Dr. Bingham declined to treat

Knowles.  Dr. Bingham stated that he would refer Knowles to Dr. Idusuyi.

R. 337.  Because Dr. Bingham was not a treating source, the ALJ was not

required to give the opinion controlling weight.

Dr. Bingham also did not opine on the severity of Knowles'

impairments in 2010.  Dr. Bingham only observed a correlation between the

arthritis in Knowles' foot and Knowles' subjective claims of pain.

Knowles refers to treatment given to him by Dr. Hibbert, Dr. Fleischi,

and Dr. Friedersdorf.  (Claimant's Brief in Support of Motion for Summary

Judgment, d/e 11, pgs 7, 8, and 9).  Treatment and opinions given by these

physicians all took place in 2012.  The treatment and opinions made no

attempt to evaluate Knowles' condition and limitations prior to the expiration

of his eligibility for DIB in 2010.

Knowles also argues that the ALJ failed to assess whether Knowles

could ambulate effectively.  The Court disagrees.  The ALJ properly found

that Knowles could ambulate effectively.  A person can ambulate effectively

if he can walk a block without the aid of two assistive devices.  Listing

§ 1.00(B)(2)(b)(2).  At the time of the hearing, he testified that he could walk a block and did not use a cane.  He testified that he used to use a cane in 2007, before the alleged onset of his disability.  Knowles never reported to anyone that he needed two canes to walk.  In 2010, he reported to Dr. Kozma that he used a cane only when he stood for extended periods of time.  On examination in 2010, Dr. Kozma found that Knowles could ambulate effectively.  Knowles testified at the hearing that he walked more in 2010 (R. 55).  No doctor reported that Knowles could not ambulate.  No doctor prescribed an assistive device to ambulate.  The ALJ's finding that Knowles could effectively ambulate is supported by substantial evidence.

Knowles argues that the RFC was conclusory.  The Court agrees that the ALJ could have more specifically identified the evidence on which he relied to conclude that Knowles could perform a limited range of medium work.  The ALJ relied, in part, on Dr. Smith's 2010 assessment.  Dr. Smith opined that Knowles could lift fifty pounds occasionally and twenty-five pounds frequently.  This opinion was consistent with medium work.  See 20 C.F.R. §§ 404.1567(c) and 416.967(c).  The ALJ gave Dr. Smith's opinion little weight, but only because Knowles' foot and ankle problem required some additional limitations on the range of medium work that Knowles could perform.  The ALJ assigned weight to the physicians'

opinions to the extent they were not inconsistent with his findings.  (R. 23)

Thus, the Court can consider that the ALJ based the medium work finding

on Dr. Smith's opinion on lifting even if he did not specifically mention the

restriction.  See Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).

Knowles' testimony at the 2013 hearing helps explain the other

exertional limitations.  Knowles testified that he could stand for two hours,

and could bend somewhat.  R. 50-51.  This testimony provided support to

the RFC's limitations on standing and walking, and the RFC's postural

limitations.  Dr. Smith observed in 2010 that Knowles could stand and/or

walk about six hours in an 8-hour work day.  R. 283.  The ALJ did not refer

to this testimony to explain the limitations, and he should have.  This was

error.  The error, however, was harmless.  The Court is firmly convinced

that the ALJ would reach the same result and a remand would be pointless.

McKinzey v. Astrue, 641 F.3d 884, 892 (7th Cir. 2011).

Knowles also argues that the ALJ read the medical evidence

improperly.  Knowles essentially asks the Court reweigh the medical

evidence.  This Court will not do so.  See Clifford, 227 F.3d at 870.  The

ALJ fairly reviewed all the evidence and drew a conclusion supported by

substantial evidence.  This Court will not reweigh the evidence.

Knowles notes that the ALJ both relied on Dr. Meyer's findings and discounted them.  Knowles argues that the ALJ's inconsistency was error. The Court disagrees.  The ALJ relied on the test results from Dr. Meyer's psychological testing at Step 3 and in formulating the RFC.  The limitation to routine, repetitive tasks reflected Dr. Meyer's finding of impaired concentration, attention, and short-term memory.

The ALJ rejected Dr. Meyer's opinion that Knowles would have difficulty working.  Dr. Meyer stated, "He reported having a hard time adapting to his current circumstances and not having much energy or initiative.  He will therefore have difficulty with maintaining job performance and working a typical work schedule."  R. 297.  The ALJ rejected this opinion because it was based on Knowles' subjective reports.  An ALJ may reject a medical finding based on subjective reports rather than objective findings.  See Diaz v. Chater, 55 F.3d 300, 307-08 (7th Cir. 1995).  Dr. Meyer's test results on which the ALJ relied were not based on subjective reports, they were based on objective findings.  Therefore, the ALJ was not acting inconsistently.  The ALJ relied on Dr. Meyer's testing, but not her opinions based on Knowles' subjective reports.

Lastly, Knowles argues that the ALJ erred by not adequately addressing the effect of Knowles' obesity.  The Court again disagrees.  The

ALJ expressly considered obesity in making the decision.  See R. 15, 18.

The ALJ adequately considered the relevant effects of Knowles' obesity.

There was no reversible error.

THEREFORE, THIS COURT RECOMMENDS THAT Defendant

Commissioner of Social Security's Motion for Summary Affirmance (d/e 12)

should be ALLOWED, Plaintiff Terry R. Knowles' Brief in Support of Motion

for Summary Judgment (d/e 11) should be DENIED, and the decision of the

Commissioner should be AFFIRMED.

The parties are advised that any objection to this Report and

Recommendation must be filed in writing with the Clerk of the Court within

fourteen days after service of a copy of this Report and Recommendation.

28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely

objection will constitute a waiver of objections on appeal.  See Video

Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local

Rule 72.2.


ENTER:   January 6, 2016


_____ s/ Tom Schanzle-Haskins_____
UNITED STATES MAGISTRATE JUDGE